**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Dunton, | No. CV-18-02652-PHX-JGZ |
| Plaintiff, | |
| v. | **ORDER** |
| AEA Federal Credit Union, et al., | |
| Defendants. | |

Pending before the Court is Defendant AEA Federal Credit Union's motion for summary judgment on the sole claim in the first amended complaint, that AEA terminated Plaintiff Michael Dunton in violation of the Federal Credit Union Act (FCUA), 12 U.S.C. § 1790b(a)(1), for engaging in protected whistleblowing activity. (Doc. 50.) The motion has been fully briefed. (Docs. 54, 56.) The Court will grant the motion.

**I.   Background[1]**

AEA is a federally chartered credit union. (Doc. 51, ¶ 1.) Between 2010 and 2015,

---

[1] The facts in the Background section are undisputed except where noted. The Court's task of identifying the undisputed facts was made difficult by Plaintiff's failure to comply with LRCiv. 56.1(b)(1), which requires a party opposing a motion for summary judgment to file a statement, setting forth "for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph . . . ." LRCiv. 56.1(b)(1). Plaintiff failed to state whether he disputed the facts in each of Defendant's paragraphs. Plaintiff submitted a separate statement of facts plus a "contravening" statement of facts; the two statements duplicate each other as to some facts yet fail to respond to many of Defendant's separately numbered facts. Moreover, Plaintiff failed to provide critical foundational information for many of his factual assertions, for example, dates, which made it difficult to determine whether Plaintiff was disputing a particular fact asserted by Defendant. After careful review of the filings, the Court has identified the facts that Plaintiff does not deny, and which are therefore admitted.

AEA was placed into conservatorship by the National Credit Union Administration (NCUA). (*Id.*, ¶ 2.) During the time relevant to this action, AEA was required to undergo NCUA examination twice a year. (*Id.*)

**Dunton's employment at AEA**

Plaintiff Michael Dunton was employed as AEA's Vice President of Accounting and Finance from July 13, 2016 to August 23, 2017.[2] (Doc. 51, ¶¶ 3, 63; Doc. 55, ¶ 1.) Prior to his employment at AEA, Dunton had never worked for a credit union. (Doc. 51, ¶ 6.)

Dunton initially reported to Adele Sandberg, who was the Executive Vice President. (Doc. 51, ¶ 4.) His duties included oversight of accounting and finance, maintaining AEA's accounting records, management, board and regulatory reporting, and providing financial forecasts, including financial forecasts for the NCUA as part of the examination process. (Doc. 51, ¶¶ 4, 5; Doc. 55, ¶¶ 2, 25.)

From the beginning of Dunton's employment, Dunton performed poorly. (Doc. 51, ¶ 7.)[3] Dunton admits that he regularly failed to meet deadlines and his work product often contained errors. (*Id.*, ¶ 9; Doc. 55, ¶ 28.) He attributes these failings to poor staffing decisions by Sandberg and "arbitrary deadlines" imposed by Sandberg. (Doc. 55, ¶ 28.)

AEA was specifically concerned about Dunton's preparation of financial documents. In 2016, Dunton was required to prepare a financial budget for 2017. (Doc. 51, ¶ 8.) AEA concluded that Dunton's knowledge was so lacking that AEA brought in a third-party consultant, Dan Olejnik, to prepare the necessary information for a NCUA examination. (*Id.*) In a memo to Sandberg, dated February 5, 2017, Olejnik wrote that "significant" problems with the 2017 budget were caused by Gagnon's departure and Dunton's general

---

[2] Dunton's exact title is disputed, but not relevant to the Court's decision. AEA refers to Dunton as the Vice President of Finance (Doc. 51, ¶ 3), while Dunton states he was the Vice President of Accounting and Finance. (Doc. 55, ¶¶ 1, 24.)

[3] Dunton initially appears to controvert the suggestion that his performance was poor, asserting that no record of his performance exists before February of 2017, and only then for an "overreaction to an inconsequential mistake made by [his] subordinate that was quickly remedied." (Doc. 55, ¶ 26.) However, Dunton admits that in early February 2017, he was placed on a Performance Improvement Plan because of performance deficiencies occurring prior to that date. (Doc. 51, ¶ 12; Doc. 55, ¶ 31.)

lack of knowledge to carry the budget through to completion. (Doc. 51, ¶ 10; Doc. 51-1, pp. 60-62.) In the memo, Olejnik also concluded that " [t]he reason for the disastrous change in loan income is that Michael [Dunton] did not notice that the December loan file he imported was corrupted." (Doc. 51-1, p. 60.) As a result, business term loan income doubled from the approved budget and, as business real estate balances increased mid-year, there was no associated monthly change in interest income. (*Id.*) Olejnik found that not all indices were identified properly and accounting for securities was suspect for various reasons. (*Id.*) [4]

Dunton does not dispute that AEA hired Olejnik to prepare necessary information for a NCUA examination in 2016 or that Olejnik wrote the February 5, 2017 memo; he states that Olejnik assisted Ryan Gagnon, the financial analyst, not Dunton. (Doc. 55, ¶ 27.) He also states that he was not the user of Firserv Vantage Program and the corrupted file was imported by Gagnon. (*Id.*, ¶ 29.)

**Dunton's Proposed Termination and Performance Improvement Plan.**

On February 3, 2017, Sandberg sent a memorandum to AEA's then-President and CEO, Brian Mendivil, recommending Dunton's termination. (Doc. 51, ¶ 11.) Sandberg wrote that Dunton consistently failed to meet deadlines, failed to conduct routine meetings, and failed to inspect the work product of his employees, "resulting in errors in Board, ALCO and budget reports." (*Id.*) Dunton was unaware at the time that Sandberg had recommended his termination. (Doc. 55, ¶ 30.) Dunton concedes that "mistakes were made," but claims they were "blown out of proportion." (*Id.*) He attributes the mistakes to the fact that Sandberg left him with an inexperienced staff that were poorly trained or had exhibited performance issues in the past. (*Id.*)

Sandberg and Mendivil decided to place Dunton on a performance improvement plan

---

[4] In his Controverting Statement of Facts, Dunton states that Olejnik's "first visit . . . coincided with [Dunton's] . . . first week of employment" with AEA, suggesting that Dunton was a new employee at the time. (Doc. 55, ¶ 27.) However, Olejnik's February 5, 2017 memo indicates that it pertains to Olejnik's "NOTES FROM THIRD VISIT," not the first visit. (Doc. 51-1, p. 60.) In February 2017, Dunton would not have been in his first week of employment at AEA.

1  (PIP) rather than terminate him because it was difficult to find qualified candidates for
2  Dunton's position in Yuma. (Doc. 51, ¶ 12.) Sandberg met with Dunton on February 8,
3  2017 and outlined the requirements for his PIP. (*Id.*, ¶ 13.) Sandberg issued a written
4  "30-Day Performance Improvement Plan" to Dunton that same day. (*Id*.; *see also* Doc.
5  51-1, pp. 72-73).) The PIP required Dunton to (1) meet a four-day month end close; (2)
6  implement a validation process; (3) correct mistakes within AEA's accounting and finance
7  software, Vantage and Prologue; (4) improve communication with employees and senior
8  leadership; and (5) complete project plans for strategic options as identified in the strategic
9  plan. (Doc. 51, ¶ 14.) Dunton does not dispute these facts. He adds that termination was
10 not discussed in the creation of the PIP, but was left as an option if Dunton did not
11 convince the executive team at the end of thirty days that he took their concerns seriously.
12 (Doc. 55, ¶ 31.) Dunton notes that he remained in his position at the end of the 30-day
13 period, implying thereby that his performance improved. (*Id.*)

14  However, on February 22, 2017, AEA provided Dunton with a performance review
15 for 2016. (Doc. 51, ¶ 15.) On a scale of 1: Immediate Improvement Required to 4:
16 Outstanding, Dunton received an overall score of 1.35. (*Id.*) Some of Sandberg's
17 comments included: Dunton fails to meet deadlines, including the month end close; fails
18 to deliver accurate data, mostly because he does not inspect the work of his staff; fails to
19 communicate effectively with his manager, peers and the Board of Directors; is unfamiliar
20 with the ALLL and has not familiarized himself with related GAAP; fails to refer to
21 applicable rules and regulations and policies and procedures; has not owned issues and
22 failures, often putting those on people of the past or staff within the department even
23 though he is ultimately responsible; and does not work as a team. (*Id.*, ¶ 16.) In addition,
24 on March 22, 2017, Sandberg issued an update to Dunton's PIP. (*Id*., ¶ 17.) In the update,
25 Sandberg noted Dunton had improved in some areas, but still required improvement in
26 several other areas. (*Id*.) The update required Dunton to: (1) implement review processes
27 for month end closing and board packet schedules; (2) create a budget variance report to
28 be included in the Board packet quarterly; (3) correct issues with Vantage and Prologue;

(4) conduct 1:1 meeting with direct reports; and (5) complete project plans for strategic options as identified within the strategic plan. (*Id*.)

**Sandberg's promotion to CEO.**

In May 2017, AEA's Board of Directors removed Mendivil as President/CEO of AEA and appointed Sandberg to replace him. (Doc. 51, ¶ 22.)

**Complaints about Dunton's behavior.**

AEA received complaints about Dunton's behavior. (*Id.*, ¶ 18.) An August 18, 2017 Corrective Action Document describes complaints that Dunton verbally disparaged an employee to another employee on August 3, 2017, and on August 10, 2017, he responded to an executive team member in a hostile manner causing other employees to feel uncomfortable. (*Id*., ¶¶ 19-20 (citing Doc. 51-9, pp. 89-91.)) AEA also asserts, and Dunton admits, that Dunton encouraged an employee to take a job with a competitor. (Doc. 51, ¶ 21; Doc. 55, ¶ 36.)

Dunton states that he never received any complaints about his behavior and did not know about the Corrective Action Document until his September 2019 deposition. (Doc. 55, ¶ 34.) Dunton acknowledges an incident with an executive team member, but disputes AEA's characterization of his conduct. (*Id.*, ¶ 35.) Dunton states that the member "mockingly asked if [Dunton] would like a hug from them. [Dunton] was taken back at this unwanted physical advance . . . but did not threaten them in any way." (*Id.*) Dunton does not deny that he responded in a hostile manner.

**Dunton's Failure to Complete Necessary Financial Forecasts.**

An NCUA examiner was scheduled to visit AEA for an examination in August 2017. (Doc. 51, ¶ 23.) Sandberg asked Dunton to prepare a financial forecast for 2018, which was necessary for the NCUA examination and for AEA's own internal procedures. (*Id*., ¶¶ 23-24.) Sandberg asked Dunton to create financial forecasts with three scenarios: (1) most likely; (2) best case; and (3) worst case. (*Id*., ¶ 25.) AEA regularly completed forecasts with different scenarios and Olejnik had prepared the same type of forecast the prior year. (*Id*., ¶ 26.) Dunton's 2016 performance review specifically referenced the

need for him to "assess historical and desired performance and plan and forecast accordingly with reasonable expectation to achieve forecasted results." (*Id.*, ¶ 27.) Dunton agreed to prepare the forecasts and did not raise any concerns at that time. (*Id.*, ¶ 28.) The forecasts were due on August 1, 2017. (*Id.*)

Dunton did not deliver the required forecasts by August 1, 2017, but instead provided an incomplete "working document" on August 3, 2017. (*Id.*, ¶ 29.) Sandberg noted that the document did not contain necessary information such as written assumptions, capital expenditures, and details on operating expenses and once again had to ask for Dunton to provide the necessary information. (*Id.*, ¶ 30.) Dunton does not dispute that he did not deliver the required forecasts by August 1, but states that he presented Sandberg with the financial forecast basis, which she rejected. (Doc. 55, ¶ 38.)

On August 7, 2017, Sandberg met with Dunton to inquire about the status of the forecasts. (Doc. 51, ¶ 31.) Dunton had still not completed the forecasts and provided Sandberg with some incomplete estimates. (*Id.*) Dunton noted that AEA had net income of $2,031,702 in 2016, but projected that AEA would most likely have net income of $514,606 in 2017 and $172,583 in 2018. (*Id.*, ¶ 32.) Sandberg expressed concern that Dunton was not taking relevant factors into consideration and that the estimates were too low. (*Id.*, ¶ 33.) Sandberg also noticed that the forecasts had some mistakes, such as including expenses for programs that were no longer being used. (*Id.*) Sandberg asked Dunton to revise the forecasts based on AEA's past and current performance. (*Id.*, ¶ 34.) Dunton said he would revise his forecast and provide Sandberg with final forecasts. (*Id.*; Doc. 55, ¶ 40.) Dunton states that Sandberg continued to reject his work without specifically detailing what she was objecting to. (Doc. 55, ¶¶ 39, 41, 42.)

On August 16, 2017, Dunton provided some draft income statement forecasts with three scenarios: (1) Most Likely (Base); (2) Best Case (High); and (3) Worst Case (Low). (Doc. 51, ¶ 35.) His most likely scenario had net income of $674,300 for 2017[5]— a significant decrease of $1,357,402 from net income of $2,031,702 in 2016. He then

---

[5] Given the context, the Court presumes that Defendant meant 2017, not 2016.

- 6 -

projected net income of $1,648,091 for 2018, which was $383,611 lower than 2016. (*Id.*) In his High Case, Dunton projected net income of $1,046,250 in 2017 and $1,535,280 in 2018, respective differences of $985,452 and $496,422 from 2016's net income. (*Id.*, ¶ 36.) Dunton's Low Case forecast had net income of $682,668 for 2017, which was higher than his Most Likely scenario. (*Id.*, ¶ 37.) He then projected net income of -$361 for 2018. (*Id.*)

The forecasts concerned Sandberg because they failed to take into consideration AEA's past performance and the fact that AEA was performing well (*Id.*, ¶ 38.) The forecasts also had obvious mistakes, such as the low estimate being higher than the most likely estimate. (*Id.*, ¶39.) Dunton does not dispute the numbers in his forecasts, other than to state the numbers were "preliminary" and were not finalized. (Doc. 55, ¶¶ 43, 44, 45.) Dunton, nonetheless, asserts there were no errors in the forecasts. (*Id.*, ¶ 47.) [6]

On August 16, 2017, Sandberg emailed Dunton and outlined the requirements she was seeking for the forecasts. (Doc. 51, ¶ 40 (citing Doc. 51-1, pp. 129-130).) According to Sandberg, during this process, Dunton had a fundamental misunderstanding of what he was asked to do despite Sandberg's instructions. (*Id.*, ¶ 41.) At his deposition, Dunton testified that he was not actually doing what Sandberg had requested, but was calculating "the most-likely scenario and then two lower scenarios . . . ." (*Id.*, ¶ 41.) In his later affidavit, Dunton stated that he gave three sets of numbers: high case, low case and most likely. (Doc. 55, ¶ 49.)

During August 2017, Dunton provided Sandberg with a variety of different "working documents" which contained very different numbers. (Doc. 51, ¶ 44.) He was required to have a completed, fully documented forecast before the NCUA exam started on August 14, 2015. (*Id.*)

On August 18, 2017, Dunton still had not completed the required financial forecasts. (*Id.*, ¶ 45; Doc. 55, ¶ 53.) Dunton met with Sandberg that day and stated that he believed AEA would have 2018 net income of between $0 and $1 Million. (Doc. 51, ¶ 45.)

---

[6] Dunton does not explain how it would not be a mistake that his low estimate was higher than his most likely scenario estimate.

Sandberg gave Dunton a deadline of August 23, 2017 to complete the forecasts. (*Id.*, ¶ 48.)

After meeting with Dunton on August 18, 2017, Sandberg met with Human Resources Director Regina Twomey and Vice President of Commercial Lending Darrin Davidson and told them that Dunton had failed to complete the financial forecasts and that he had a deadline of August 23, 2017 to prepare the forecasts and present them to the NCUA examiner. (*Id.*, ¶ 49.) Sandberg stated that if Dunton did not do so, they were to terminate his employment.[7] (*Id.*)

According to Dunton, Sandberg sharply criticized him during the August 18 meeting primarily because she felt that his financial forecast for 2018 was too low. (Doc. 55, ¶ 14.) In addition, Dunton states that Sandberg told him twice at meeting end that he was not to talk to NCUA examiner Charles Stanley at all and, if he did, she would consider such communication insubordination. (*Id.,* ¶ 15.)

Dunton did not complete the forecasts by the deadline. (Doc. 51.*,* ¶ 51; Doc. 55, ¶ 53.) Dunton did not offer the forecast because Sandberg refused to accept the net income amount. (Doc. 55, ¶ 53.) Dunton does not dispute that at some point, he told Sandberg that creating different forecast scenarios was a waste of time. (Doc. 51, ¶ 43; Doc. 55, ¶ 50.) According to Dunton, that is because Sandberg continuously objected without giving any specific reasons for her objections.[8] (Doc. 55, ¶ 50.)

---

[7] Sandberg was planning to be out of town on August 23. (Doc. 51-1, ¶35.)

[8] The parties dispute how much direction Sandberg did or did not give Dunton. The record includes the August 16, 2017 email exchange between Sandberg and Dunton, detailing some information that needed to be included in the forecast, and Dunton's response to the email. The email reads:
> Michael,
> You need to include the underlying assumptions for the three scenarios and our strategies to support the scenarios. The scenarios are (1) Most Likely (Base), (2) Best Case (High) and (3) Worst Case (Low) and each have assumptions, please update memo with the high level assumptions for both the balance sheet and income statement. I also asked for a list of major capital outlays – the total for each project, the portion that is capitalized and the associated maintenance in addition to identifying the "swap" costs. What expense, annual, is being removed or "swapped" by the new outlay and where do we see that in the income statement. Also need to make sure we know what is still being determined - ask Jose

Dunton states that after Sandberg prohibited him from meeting with Stanley or giving him anything, Dunton was in limbo as he no longer could produce a new forecast with a higher number for net income without it being an attempt at fraud toward the NCUA and others. (Doc. 55, ¶ 56.) According to Dunton, at no time did Sandberg communicate with him from that point forward. (*Id*.)

**Dunton's meeting with NCUA Examiner, Charles Stanley.**

On or around August 21, 2017, Sandberg instructed Anna Corona to set up a meeting with Dunton and NCUA examiner Stanley. (Doc. 51, ¶ 50.) Corona attempted to schedule a meeting, but Dunton refused, stating he had been told not to meet with Stanley. (Doc. 51, ¶ 52; Doc. 55, ¶¶ 17, 57.)

Dunton did meet with Stanley on August 22, 2017. (Doc. 51, ¶ 53; Doc. 55, ¶¶ 58, 59.) According to Dunton, Stanley came into Dunton's office, after closing time, uninvited, to

---

> there are a couple of Core items we do not have costs for and we should note that Correlation costs will most likely increase and join the 5-year amortization. Eugene's list can be improved by having a page that details the outlays, segregated by capital and recurring maintenance, the amortized/prepaid term, the monthly impact and the period the expense begins. Eugene pretty much has it but his document does not total the outlays. His second sheet is fine for now as your commentary can tell readers where to find the expenses and what are increases and what are decreases.
>
> As you know, I've requested detail and that request still stands – need 2017 to roll by month from July since we have closed books to year end for both balance sheet and income statement. 2018 should have each month with the income statement ending with totals. Behind that, comparisons to actual 2016, forecast 2017, budget 2017 and forecast 2018. We can talk about just how much detail – the Balance Sheet has too much. Need underlying assumptions – growth, major capital outlays, major expenses (salary & benefits, PLLL, Legal, etc.), other income movements, RATES.
>
> I hope to have time on Friday to meet with you in hopes the re-forecast and forecast can meet my expectations by an agreed upon date and that date will be no later than mid-September.
>
> Thanks, Adele
> Adele Sandberg
> President & CEO

(Doc. 51-1, pp. 129-130.) Dunton replied to the email, asking for examples of what Sandberg "wanted expanded in describing the assumptions." (*Id*., p. 129.)

meet. (Doc. 55, ¶¶ 18, 58, 63.) Dunton told Stanley that he was prohibited by Sandberg from speaking with him and giving him any forecast. (*Id.,* ¶ 59.) Dunton told Stanley, verbally, what he had forecasted for 2017 and 2018. (*Id.*) Dunton told Stanley that he expected AEA to have 2018 net income of between $0 and $1 Million. (Doc. 51, ¶ 54; Doc. 55, ¶ 59.) Dunton testified that he also told Stanley that Sandberg thought the forecast numbers should be higher. (Doc. 51, ¶ 55.)

**Dunton's termination.**

On August 23, 2017, Sandberg spoke to Twomey and Davidson while she was out of town attending a conference. (Doc. 51, ¶ 59.) She asked whether Dunton had completed the financial forecasts and presented them to Stanley. (*Id.*) Twomey and Davidson confirmed with Stanley that Dunton had not provided him with the financial forecasts. (*Id.*, ¶ 60.) They informed Sandberg, and she instructed them to terminate Dunton's employment. (*Id.*, ¶ 61.)

Twomey and Davidson met with Dunton on August 23, 2017 and informed him that he was terminated because he was not getting his work done and that he had threatened or harassed other employees. (Doc. 51, ¶ 63.) Neither Dunton nor Stanley told Sandberg, Twomey, or Davidson that Dunton claimed to have reported illegal conduct to Stanley or to have reported to Stanley that Sandberg wanted him to produce forecasts that were too high. (Doc. 51, ¶ 62; Doc. 55, ¶ 62.) At the time Dunton was terminated, Sandberg, Twomey, and Davidson were unaware that Dunton claimed to have reported potential illegal conduct to Stanley on August 22, 2017. (Doc. 51, ¶¶ 64, 66.) Dunton admits that he did not tell anyone at AEA about his conversation with Stanley, and Dunton has no information that Stanley told anyone about Dunton's alleged complaints. (*Id.*, ¶ 65.)

**Dunton's claim regarding protected activity.**

Dunton's testimony about the substance of his meeting with Stanley is found in the transcript of his September 25, 2019 deposition and in his affidavit, signed on January 25, 2020.

Dunton testified at his deposition and in his affidavit that he told Stanley that Sandberg

- 10 -

1  prohibited him from speaking with Stanley or giving him anything. (Doc. 51-1, pp. 37-38;
2  Doc. 55, ¶¶ 19, 59, 62.)  Dunton testified at deposition that he informed Stanley that
3  Sandberg thought the forecast numbers should be higher (Doc. 51, ¶ 55), and he testified
4  that he believed that it would have been fraudulent to present a forecast to the NCUA with
5  numbers that were too high.  (Doc. 51, ¶ 56.)

6  At his deposition, Dunton testified that he reported to Stanley only that he and
7  Sandberg had different opinions about projected net income for AEA in 2018 and that
8  Sandberg thought the net income projections should be higher.  (Doc. 51, ¶ 76.)  In his
9  affidavit, Dunton states that he also informed Stanley that he was being pressured by
10 Sandberg to inflate the numbers.  (Doc. 55, ¶ 68.)  Dunton "believes it would be illegal
11 for Ms. Sandberg to prohibit him from speaking with a NCUA examiner given the fact
12 that Ms. Sandberg had continuously pressured Plaintiff into falsely inflating the forecast
13 numbers, which is fraudulent conduct, and Plaintiff *would* have informed such to the
14 examiner."  (Doc. 55, ¶ 74 (emphasis added); *see also* Doc. 51, ¶ 83.)  Dunton believes
15 that Sandberg thought AEA could escape Special Actions by NCUA if AEA maintained
16 a .70% return on assets, and therefore pressured him to commit fraud to elevate the 2018
17 financial forecast.  (Doc. 55, ¶ 23.)

18 Although Dunton claims that Sandberg rejected his forecasts because she wanted the
19 numbers to be higher, Dunton concedes that Sandberg never told Dunton what she thought
20 the net income should be and never asked him to falsify any financial statements.  (Doc.
21 51, ¶ 79; Doc. 55, ¶ 71.)  Dunton testified that no one at AEA asked him to falsify any of
22 the underlying financial data and Sandberg never asked him to "puff up" the forecast
23 numbers."  (Doc. 51, ¶ 58.)  Dunton states in his affidavit, that there was "a clear
24 implication" that the net figures Plaintiff provided Sandberg were too low, because she
25 repeatedly rejected his numbers and because Sandberg stressed in a July manager's
26 meeting the importance of maintaining minimum levels of income for certain reasons.
27 (Doc. 55, ¶ 61; *see also* Doc. 55, ¶ 51.)

28 During his deposition, Dunton first testified that he did not report any illegal conduct

1 to Stanley and that he had not witnessed any illegal conduct. (Doc. 51, ¶ 77.) He testified
2 that he did not report any type of illegal conduct to anyone within AEA such as the board
3 or any other executives because "[a]gain, I don't believe I have ever witnessed any illegal
4 conduct." (Doc. 51-1, p. 41.) After conferring with counsel during a break, Dunton
5 testified that what he told Stanley that he believed was illegal conduct, was that he was
6 being forced to provide a forecast well beyond what he thought was appropriate and that
7 it was misrepresenting the strength of AEA's earnings. (Doc. 51, ¶ 78; Doc. 51-1, p. 56.)
8 In his affidavit, Dunton states his subsequent testimony about the illegality of a high
9 forecast was a clarification of his earlier testimony that he did not report or see any illegal
10 conduct. (Doc. 55, ¶ 70.) Dunton further asserts in his affidavit, that he told Stanley that
11 he was being pressured by Sandberg to inflate the numbers. (Doc. 55, ¶ 62.)

12 Dunton acknowledged at his deposition that forecasts are estimates based on the
13 opinions of the people creating the forecast. (Doc. 51-1, p. 25.) Dunton acknowledged
14 that it is possible that different people could have different opinions about what a forecast
15 should be: "If you had ten different people, you would get ten different answers." (Doc.
16 51, ¶ 42.) Dunton explained at deposition that he believed that Sandberg wanted him to
17 "create forecasts that would be against [his] . . . professional *opinion*." (Doc. 51-1, p. 25
18 (emphasis added).)

19 Dunton testified that he was not aware of any statutes or regulations that governed
20 what had to be included in any forecast to the NCUA, and that Dunton reported no
21 violation or statute or regulation to Stanley. (Doc. 51, ¶¶ 78, 81; Doc. 51-1, p. 28; *see also*
22 Doc. 55, ¶¶ 70, 73.) Dunton also acknowledged that the NCUA had access to the
23 underlying financial data behind the forecasts, so it could have confirmed or disputed a
24 forecast provided by AEA. (Doc. 51, ¶¶ 57, 82.)[9] After AEA terminated Dunton, it
25 discovered that Dunton had multiple different spreadsheets with different forecasts. (Doc.
26 51, ¶ 85.) Virtually all of the spreadsheets contained errors and improper data. (*Id.*) In
27 his affidavit, Dunton states that if errors were made, it was the lack of specific detail from

28 ---
[9] In his later affidavit, Dunton contends he does not know what the NCUA would have done. (Doc. 55, ¶ 60.)

- 12 -

Sandberg which was the cause of it. (Doc. 55, ¶ 76.)

**Dunton's Amended Complaint.** Dunton's sole claim is for retaliation under FCUA, 12 U.S.C. § 1790b. (Doc. 7.) Dunton alleges that AEA terminated his employment in retaliation for his reporting AEA violations of federal law to Stanley.

**AEA's Motion for Summary Judgment**.

AEA seeks summary judgment on three grounds. AEA argues (1) Dunton fails to establish a causal connection between his termination and his alleged whistleblowing activity; (2) Dunton did not engage in protected activity because he did not report a violation of a law or regulation as required for whistleblower protection; and (3) AEA had a legitimate, non-retaliatory reason for Dunton's termination that was not a pretext for retaliation. If the Court does not grant summary judgment on Dunton's retaliation claim, AEA seeks summary judgment on damages, asserting Dunton failed to mitigate his damages. (Doc. 50.)

The Court concludes that summary judgment is properly entered because Dunton fails to establish a causal connection between his termination and his alleged whistleblowing activity and also because AEA had a legitimate, non-retaliatory reason for Dunton's termination that was not a pretext for retaliation. Having found two of the bases for summary judgment dispositive of this case, the Court does not address AEA's remaining arguments.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) that after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). "Only disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

When considering a motion for summary judgment, the court accepts as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not merely rest on its pleadings; the non-moving party must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256–57 (plaintiff must present affirmative evidence to defeat properly supported motion for summary judgment); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986) (nonmovant must present more than "some metaphysical doubt as to the material facts"). A summary judgment motion cannot be defeated "with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

### B. Elements of Retaliation Claim

Pursuant to the FCUA:

> No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the Board or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.

12 U.S.C. § 1790(b)(a)(1). To establish a prima facie claim of retaliation under this provision, a plaintiff must demonstrate that: (1) he engaged in protected activity; (2) defendant knew of this exercise of his protected rights; (3) defendant subsequently took an employment action adverse to the plaintiff; and (4) there was a causal connection

between the protected activity and the adverse employment action.[10]  *Kittle v. C-Plant Fed. Credit Union*, No. 5:08-CV-00114-R, 2010 WL 1949675, at * 2 (W.D. Ky. May 13, 2010) (citing *McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 964 (6th Cir. 2004)).

Once the plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a nonretaliatory reason for the action taken. *Kittle*, 2010 WL 1949675, at * 2 (citing *McNett*, 118 F. App'x at 194).  The burden on the defendant at this phase is one of production rather than persuasion.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  If the defendant proffers a legitimate nonretaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's stated reason was pretextual. *Kittle*, 2010 WL 1949675, at * 2 (citing *McNett*, 118 F. App'x at 194).  "To do so, [the plaintiff] must show either: '(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decision; or (3) that they were insufficient to motivate the employment decision.'" *Id.* (quoting *McNett*, 118 F. App'x at 194). The "plaintiff must prove, by a preponderance of the evidence that the defendant's real motive for the adverse action was the plaintiff's protected activity." *Bohac v. Kellogg Co. Emp. Fed. Credit Union*, No. 8:11 CV338, 2012

---

[10] No Ninth Circuit case specifically identifies the elements of a prima facie case under § 1790b(a)(1). Because case law interpreting § 1790b is sparse, "courts have looked to case law construing comparably-phrased anti-retaliation provisions in other federal employment-discrimination statutes, such as Title VII, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act (ADA), *id.* § 12101 *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, as well as other federal whistleblower statutes, such as the False Claims Act (FCA), 31 U.S.C. § 3730(h), the Safety Transportation Assistance Act (STAA), 49 U.S.C. §§ 31105(a)(1)(A), and FIRREA § 1831j(a)(1)." *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 43–44 (1st Cir. 1999) (citations omitted). Here, the parties agree that the elements identified in *Kittle* apply to this case. (Doc. 50, p. 10; Doc. 54, pp. 11-12.) The Court notes that the test enunciated in *Kittle* is consistent with that applied by the Ninth Circuit in Title VII cases. *See e.g. Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196-97 (9th Cir. 2003) (prima facie case of retaliation under Title VII requires evidence that (1) plaintiff engaged in a protected activity, (2) plaintiff suffered an adverse employment action, and (3) there was a causal link between plaintiff's activity and the employment decision; plaintiff must also make showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity); *and Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (applying burden-shifting framework to retaliation claims under Title VII).

WL 12884779, *4 (D. Neb. Dec. 28, 2012) (applying § 1790b).

### III. Discussion

#### A. Plaintiff cannot show a causal connection between his alleged protected activity and his termination.

Dunton fails to make a showing sufficient to establish the existence of a causal connection between his alleged protected activity and his termination, an element essential to his case, and on which he will bear the burden of proof at trial. Assuming the information Dunton relayed to Stanley was protected activity because it disclosed a violation of federal law by AEA,[11] Dunton fails to present any evidence that he was fired on account of his reporting the illegal conduct to Stanley. Dunton fails to point to any fact showing that any of the individuals involved in his termination knew that he told, or claimed to have told, Stanley about alleged illegal conduct by AEA. Indeed, the only evidence is to the contrary: Sandberg, the person who made the decision to terminate

---

[11]The FCUA "narrowly prohibits retaliation based on the report of a possible legal violation to either the NCUA Board or the U.S Attorney General." *Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1023 (5th Cir. 2011) (citing *Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1254–55 (9th Cir. 1997) and additional authority). "A plaintiff invoking the protection of § 1790b should be prepared to point the court to his or her specific communication to the NCUA or Attorney General, describing an alleged violation of law or regulation, real or 'possible.'" *Bohac*, 2012 WL 12884779, at *4 (citing *Schroeder*, 664 F.3d at 1023). If a plaintiff has no reasonable belief of a violation, his claim must fail. *Id.* (citing *Green*, 507 F.3d 662 (if plaintiff had no reason to believe there was a false or fraudulent claim, he is not protected from retaliation under the False Claims Act.))

The Court has serious doubts that the evidence of Dunton's communications to Stanley can establish a reasonable belief by Dunton that he engaged in protected activity by reporting "any possible violation of any law or regulation." Dunton does not identify any statute or regulation that he believes AEA violated. Although Dunton argues in his response that his conversation with Stanley "falls squarely within the confines and protections of 12 U.S.C. § 1790(b)," (Doc. 54, p. 13), that provision generally describes the relationship of federal credit unions to the NCUA. It does not relate to the preparation of financial forecasts or set forth any standards or requirements. S*ee Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006) (employee who alleges fraud with no reasonable basis for believing there was fraud is not protected from retaliation by the False Claims Act); *see also Green*, 507 F.3d 662 (plaintiff's failure to identify conduct by defendant that violated the False Claims Act or conduct in which plaintiff even suspected that the defendant's practice had led to a false statement was fatal to retaliation claim); *Bohac*, 2012 WL 12884779, at * 4 (finding plaintiff's description of a myriad of complaints and criticisms she communicated to the NCUA about the management of defendant credit union insufficient to support inference that, "somewhere among those communications, she provided information regarding a possible violation of law or regulation.").

Dunton, and Davidson and Twomey, the persons who communicated the termination to Dunton, were unaware of the content of any discussion Dunton had with Stanley. Dunton himself testified that he did not tell anyone at AEA about his conversation with Stanley, and Dunton acknowledged that he has no evidence that Stanley told anyone about the subject matter of their conversation.

In his response to the motion for summary judgment, Dunton argues that a causal connection exists because Sandberg, "after discovering that Plaintiff did speak with Mr. Stanley, . . . immediately terminated [him]." (Doc. 54, p. 15.) The fact that the termination followed the meeting is insufficient, in itself, to establish the casual connection. Dunton does not contend that meeting with Stanley was protected activity, and he points to no evidence to support an inference that Sandberg prohibited him from meeting with Stanley to prevent him from reporting alleged violations. His only evidence on this point is his subjective belief that Sandberg might have thought Dunton would report to Stanley that Sandberg wanted him to increase the numbers in the 2018 financial forecast beyond what he believed what was appropriate. But Dunton's subjective belief is insufficient to establish a causal connection, and he fails to point to any evidence that the request to change the forecast was inappropriate, lacked foundation, or was contrary to law. (This is not surprising, as Sandberg's requested changes to the forecast proved to be well-taken in light of subsequent events.) Consistent with the conclusion that there is no evidence that Sandberg's forecast request was improper, Dunton admits that at no time did he complain to anyone at AEA that he was being asked to do something illegal, and he concedes that no one at AEA asked him to falsify any of the underlying financial data. The only concern Dunton raised to anyone at AEA was that he was not provided with enough guidance on what Sandberg wanted and that he believed creating three scenarios was a waste of his time. The Court must draw all reasonable inferences from the evidence in the nonmovant's favor, but any such inferences must be reasonable in view of other undisputed background or contextual facts. *See T.W. Elec. Service v. Pac. Contractors Assoc.*, 809 F.2d 626, 632 (9th Cir. 1987). On the undisputed facts, no reasonable juror

could conclude that Sandberg wanted to prevent Dunton from meeting with Stanley because she thought Dunton would report to Stanley that AEA was pressuring Dunton to produce a fraudulent forecast.

Finally, Dunton could not have been terminated in retaliation for speaking to Stanley because the undisputed evidence shows that Sandberg decided to terminate Dunton on August 18, 2017, if he failed to complete the financial forecasts by August 23, 2017. Sandberg communicated this directive to Twomey and Davidson because she was going to be out of town on the day the forecasts were due. It is undisputed that Dunton failed to complete the financial forecasts by this deadline. "[A]n employer's decision on a course of action made prior to learning of the employee's protected activity does not give rise to an inference of causation." *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (citing *Miller v. Fairchild Indus., Inc.*, 730 F.3d 730, 731 n.1 (9th Cir. 1986)).

### B. AEA had a legitimate, non-retaliatory reason for terminating Dunton's employment.

AEA produced undisputed evidence showing that Dunton was terminated because he consistently failed to perform well, failed to meet deadlines, and exhibited poor communications with his peers and subordinates. Sandberg recommended Dunton's termination in February 2017—six months before Dunton claims to have engaged in protected activity. Although Dunton was not terminated, he was placed on a PIP. Dunton's subsequent performance was not satisfactory and the final straw was Dunton's failure to prepare the 2018 financial forecast.

Dunton does not refute the reason for his termination, nor does he present any evidence from which a juror could reasonably conclude that retaliation motivated AEA's termination of Dunton. At bottom, Dunton acknowledges that he was performing poorly. Dunton admits the facts underlying Sandberg's decision to terminate him. Dunton admits that he did not provide the forecast required for the NCUA examination as directed and that he told his superior that certain forecasts she requested were a waste of time. He admits that he made mistakes during his employment, but claims those mistakes were

"blown out of proportion." Dunton blames his subordinates for his mistakes and blames Sandberg for inadequate staffing and not giving him sufficient direction, but his explanations only support Sandberg's observation in her February 22, 2017 performance review of Dunton that Dunton, "has not owned issues and failures, often putting those on people of the past or staff within the department even though he is ultimately responsible for decisions his team makes or does not make."

The record fully supports AEA's assertion that it terminated Dunton for a legitimate, non-retaliatory reason – his poor performance. Dunton's explanation for his poor performance does not suggest in any way that AEA's reason was a pretext for retaliation. Dunton does not show that the proffered reason for his termination had no basis in fact, did not actually motivate the decision, or that the reason was insufficient to motivate the employment decision. *See Kittle*, 2010 WL 1949675, at * 2

### IV. Conclusion

For the foregoing reasons, the Court will grant AEA's Motion for Summary Judgment.

IT IS ORDERED that Defendant's Motion for Summary Judgment (Doc. 50) is GRANTED. The Clerk of Court is directed to enter judgment accordingly and to close the file in this action.

Dated this 19th day of August, 2020.

_____
Honorable Jennifer G. Zipps
United States District Judge